**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAKKA OKUNCHAEVA,<br><br>   Petitioner,<br>  v.<br><br>WARDEN, ADELANTO ICE PROCESSING CENTR, et al.,<br><br>   Respondents. | No. 5:26-CV-2349-DSR<br><br>**ORDER GRANTING PETITIONER'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION (Doc. No. 3)** |

Before the Court is Petitioner Makka Okunchaeva's Ex Parte Application ("Application") for Temporary Restraining Order ("TRO") and Order to Show Cause re Preliminary Injunction ("OSC").  Doc. No. 3.  The Court finds this matter appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of and in opposition to the Application, the Court **GRANTS** the Application, and issues the requested TRO and OSC as specified further below.

1. **BACKGROUND**

 A. **Factual Background**

The following facts are drawn from the Verified[1] Petition and exhibits attached to it and the Ex Parte Application.  Though given an opportunity to

---

[1] "A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief."  Thalheimer v. City of San Diego, 645 F.3d 1109, 1116 (9th Cir. 2011) overruled on other grounds by, Board of Trs. of (cont'd . . .)

respond to the Application, and therefore to contest any of the facts stated therein, Respondents chose not to do so and instead argued only that the matter should not be considered on an emergency basis, as discussed below. Thus, for purposes at least of this Application, these facts are uncontested.

Petitioner is a citizen of Russia who has been detained by immigration authorities since April 24, 2026. See Pet. at ¶ 12. She is presently being held by Respondents at the Immigration and Customs Enforcement ("ICE") Processing Center in Adelanto, California, within this judicial district. Id.

Petitioner entered the United States in March 2022 with her spouse, Magomed Aleroev. Id. at ¶ 41; Ex. "C." In April 2022, ICE determined that Petitioner was not a flight risk, nor a danger to the community and released her into the United States at liberty, subject to conditions of release. Id. at ¶ 41; Ex. "D." As part of her release, she was required to attend regular ICE check-ins. Id. Petitioner attended her ICE check-ins yearly. Id. at ¶ 41. Petitioner has no criminal arrests or convictions that she is aware of. Id. at ¶ 42. When she went in for her most-recent ICE check-in on April 24, 2026, however, she was detained and has been held by Respondents ever since. Id. at ¶¶ 12, 44. Petitioner received no notice of her impending re-detention, no explanation of the justification for it, and no opportunity to contest it before a neutral decisionmaker. Id. at ¶ 58.

### B.    Procedural History

Petitioner filed her Petition for Writ of Habeas Corpus at approximately 6:20 p.m. on May 4, 2026. See Doc. No. 1. Concurrently with the Petition, she filed the Application for TRO and OSC re Preliminary Injunction. See Doc. No. 3.

---

Glazing Health & Welfare Tr. v. Chambers, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc). The Petition is verified by Petitioner's counsel, as permitted by 28 U.S.C. § 2242 ("Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf."). See Pet. at 21. Citations throughout this Order to page numbers are to the ECF page number of the respective document as printed on the top of each page of the document by the Court's CM/ECF System.

Petitioner also consented to final determination of this matter by a United States Magistrate Judge.  See Doc. No. 4.  The matter became fully consented 24 hours following her filing of the TRO under the terms of General Order 26-05.  See Doc. No. 6 at 4:2-3, see also Doc. No. 8.

The case was docketed and assigned to the undersigned Magistrate Judge the following morning, May 5th.  See Doc. No. 5.  Pursuant to General Order 26-05, the Clerk of Court served Respondents with the Petition as well as Notice of that General Order that morning.  See Doc. No. 6.  After reviewing the Application, the Court ordered Respondents "to file any Opposition to the Application no later than noon on Thursday, May 7, 2026."  Doc. No. 7.  The Court further ordered that "Petitioner may file a Reply no later than Friday, May 8. Briefing on the underlying Petition shall be as set forth in General Order 26-05."  Id.

Respondents filed their Opposition to the Application on May 7, 2026, as discussed below.  See Doc. No. 10.  Petitioner filed her Reply on May 8, 2026.  See Doc. No. 12.  The Court determines that oral argument will not be of material assistance on this Application and therefore rules as follows on the basis of the papers timely submitted.  See Fed. R. Civ. P. 78; Local Rule 7-15.

**2.    LEGAL STANDARD**

Federal Rule of Civil Procedure 65(b) governs temporary restraining orders.  A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22 (2008).  The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held.  Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda City., 415 U.S. 423, 439 (1974).  The purpose of a preliminary injunction, in turn, is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered.  See U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010).

The standard for a TRO is similar to the standard for a preliminary injunction. Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc., 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009).  To obtain a TRO or a preliminary injunction, the plaintiff must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (citations omitted). Alternatively, where there are merely "serious questions going to the merits," the moving party may still obtain a preliminary injunction where the balance of hardships "tips sharply" in the moving party's favor, and where the moving party also shows a likelihood of irreparable injury and that an injunction is in the public interest.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

Also, a TRO is a kind of ex parte application, so the moving party must "establish why the accompanying proposed motion for the ultimate relief requested cannot be calendared in the usual manner.  In other words . . . the moving party [must show why it] should be allowed to go to the head of the line in front of all other litigants and receive special treatment."  Mission Power Engineering Co. v. Continental Cas. Co., 883 F.Supp. 488, 492 (C.D. Cal. 1995) (explaining that the applicant for ex parte relief must demonstrate urgency and that it is without fault in creating the urgency).

**3.     DISCUSSION**

The Court finds Petitioner has met her burden to show sufficient grounds for consideration of the Application on an ex parte emergency basis, and has further shown on the merits that a TRO should issue compelling her forthwith release, pending determination of a Preliminary Injunction or final determination on the Petition on its merits.

4

**A.    Emergency Consideration of the Application is Appropriate**

Pursuant to General Order 26-05, this case is subject to an expedited briefing schedule by which Respondents' Answer is due seven days after the Clerk's Office issues the scheduling notice.  Here, that will be Tuesday, May 12, 2026, following the issuance of the scheduling notice the morning after the Petition and TRO Application were filed.  "The assigned Judge may modify any portion of the standard scheduling order as the circumstances of the case may require."  G.O. 26-05 at 3:13-14.  The General Order also addresses Temporary Restraining Orders and Preliminary Injunctions.  It provides that the

> standard scheduling order is intended to provide a
> prompt resolution to habeas petitions and reduce the
> contemporaneous filing of applications for a temporary
> restraining order.  Applications for temporary restraining
> orders should be reserved for cases where the petitioner
> alleges imminent, irreparable harm that cannot be
> addressed by the standard scheduling order or by
> expediting the briefing schedule.

Id. at 3:23-27.

The General Order is far from a "general prohibition on TRO applications," however, and specifically provides that "[i]f the petitioner believes that an application for a temporary restraining order is appropriate, the application must be filed as a separate document from the petition, and must comply with Federal Rule of Civil Procedure 65 and Local Civil Rules 65-1 and 7-19.  The filing of an application for a temporary restraining order does not alter or suspend the parties' obligations under the standard schedule for briefing the petition for final disposition."  Id. at 3:1-7.

Petitioner filed such a separate application concurrently with her Petition.  See Application (Doc. No. 3).  She asserts in that Application that she is the

"primary caregiver for her [United States Citizen] son, who suffers from a severe form of epilepsy due to a genetic mutation in SPTAN 1" who "is now in the care of his father who cannot work while looking after his son given the extensive care that the child need[s]." Id. at 2:5-6, 14-15.  Because of his condition, Petitioner's son suffers multiple seizures daily, "which requires medication to be administered by his parents," is severely malnourished, and therefore "requires a therapeutic diet and depends on his parents to be fed." Id. at 7:2-4.  Petitioner has become uniquely suited to be her son's primary caregiver and manage his condition.  See Pet. at Ex. "F."  Her son requires regular suction to clear his airways.  Id.  Petitioner is trained to perform life-saving procedures, including CPR, and has had to use her training on multiple occasions to save her son's life.  Id.  Petitioner therefore argues in the Application that "[e]xpedited relief is necessary to prevent irreparable injury before a hearing on a preliminary motion may be held, specifically, the death or illness of her [United States Citizen] son."  Application at 2:17-18.

Upon reviewing the Application, the Court found that Petitioner had alleged there imminent, irreparable harm that cannot be addressed by the standard scheduling order, and therefore on May 5, 2026, ordered Respondents to file an Opposition to the TRO application no later than noon on May 7, 2026, approximately 48 hours after issuance of that Order.  See Doc. No. 7.

On May 7th, Respondents timely filed what they title their "Opposition Pursuant to General Order No. 26-05."  See Doc. No. 10.  Their Opposition does not address the Application on the merits at all.  Rather, the Opposition is limited to discussing the General Order and its expedited briefing schedule.  The only argument Respondents offer is that "Petitioner's allegations fail to meet the standard of 'imminent, irreparable harm' that cannot be addressed on the expedited briefing schedule entered in this case under the General Order," and the "TRO Application does not assert that there is an emergency and should be denied for failing to meet the General Order's standard."  See Opp'n at 3:7-11.

The Court disagrees; that is why the Court specifically ordered Respondents to file an Opposition to the Application and gave them two days to do so.  The Court is well aware of the requirements of General Order 26-05.  It has denied other TRO applications on the basis that the petitioner there had not shown why the case could not be determined under the expedited briefing schedule in the General Order.  This case is different.  Petitioner includes specific information about the imminent need for her son's care.  Respondents do not acknowledge or address that issue at all.  Even under the expedited briefing scheduling in the General Order, this case will not be fully briefed for decision for several more days.  In light of the unique circumstances of this case, based on the specific information provided by Petitioner regarding her son's care needs, the Court finds there is an imminent, irreparable harm that cannot be addressed under the expedited briefing schedule in the General Order.  Therefore, the Court proceeds to consider Petitioner's request for interim relief on an emergency basis.

**B.     A TRO Should Issue Compelling Petitioner's Forthwith Release Pending Further Determination of Her Habeas Claims**

Respondents failed to address the merits of Petitioner's TRO Application at all in their Opposition.  They contest none of Petitioner's legal arguments.  They dispute none of the asserted facts.  The Application is substantively unopposed.  On the basis of the uncontroverted facts, Petitioner has shown that she is entitled to a Temporary Restraining Order under the Winter factors noted above.

**i.      Likelihood of Success on the Merits**

"Likelihood of success on the merits is a threshold inquiry and is the most important factor."  Env't Prot. Info. Ctr. v. Carlson, 968 F.3d 985, 989 (9th Cir. 2020).  Petitioner argues in the Application that she is likely to succeed, inter alia, on her procedural due process claim because she was entitled under the Fifth Amendment to a pre-deprivation hearing prior to her re-detention.  See Application at 8:10-14:17; see also Pet. at ¶¶ 54-61.  Thus, the Court's analysis

begins with whether Petitioner has shown a likelihood of success on the merits of her procedural due process claim.

The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law.  See U.S. Const. amend. V.  There is no question that these protections extend to noncitizens present in the United States.  See, e.g., Trump v. J.G.G., 604 U.S. 670, 673 (2025) (per curiam) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (internal quotation marks omitted)); Zadvydas v. Davis, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); Hussain v. Rosen, 985 F.3d 634, 642 (9th Cir. 2021) ("The Fifth Amendment entitles aliens to due process of law in deportation proceedings." (internal quotation marks and brackets omitted)).  Indeed, "the government's discretion to incarcerate noncitizens is always constrained by the requirements of due process . . . ."  Hernandez v. Sessions, 872 F.3d 976, 981 (9th Cir. 2017).  "In the context of immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'"  Id. at 990 (quoting Singh v. Holder, 638 F.3d 1196, 1203 (9th Cir. 2011)).

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections."  Brewster v. Bd. of Ed., 149 F.3d 971, 982 (9th Cir.1998).  The first step is to determine whether the individual possesses a liberty or property interest that triggers due process protections.  Board of Regents v. Roth, 408 U.S. 564, 569 (1972).  If such a constitutionally protected interest exists, the second step applies a three-step balancing test described in Mathews v. Eldridge to assess what procedural safeguards are required.  Mathews v. Eldridge,

424 U.S. 319, 334-35 (1976). Only after establishing a constitutionally protected interest does the analysis proceed to the second step.

### a. Petitioner has a protected liberty interest in her release

"Freedom from imprisonment ... lies at the heart of the liberty" that the Fifth Amendment's Due Process Clause "protects." Zadvydas, 533 U.S. at 690. "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Id. at 693. As a result, the government can only detain individuals outside of the criminal context in "certain special and 'narrow' nonpunitive 'circumstances.'" Id. at 690 (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992)).

The Supreme Court has recognized that an individual on parole or released on recognizance has a liberty interest under the Fourteenth Amendment's Due Process Clause requiring "some informal procedural guarantees." Morrissey v. Brewer, 408 U.S. 471, 482-83 (1972); see also Gagnon v. Scarpelli, 411 U.S. 778, 782 (1973) (extending Morrissey to probation revocation); Young v. Harper, 520 U.S. 143, 145 (1997) (extending Morrissey to Oklahoma's preparole program because it is also "a kind of parole"). This liberty interest exists even though a revocation of parole arises outside of the protections of criminal proceedings. Morrissey, 408 U.S. at 480. "[T]he loss of liberty entailed is a serious deprivation requiring that the parolee be accorded due process." Gagnon, 411 U.S. at 781. Further emphasizing that this liberty interest does not arise exclusively in the criminal context, the Supreme Court compared the right guaranteed to parolees to a "preliminary hearing" to that guaranteed to welfare recipients prior to the termination of their benefits. Morrissey, 408 U.S. at 485 (citing Goldberg v. Kelly, 397 U.S. 254, 267-271 (1970)).

Numerous Federal Courts have applied this rule to a conditional release granted to noncitizens in immigration proceedings, whether such release is a form of conditional parole or release on recognizance during the pendency of a removal

case or under terms of an Order of Supervision ("OSUP") after issuance of a final order of removal.  In the OSUP situation,  Courts have found the noncitizen has a constitutional liberty interest in his or her continued release from detention under the terms of his OSUP.  See Mahalati-Shirazi v. Noem, ___ F. Supp. 3d ___, No. 5:26-CV-00117-MWC-SSC, 2026 WL 174654, at *4 (C.D. Cal. Jan. 18, 2026) (citing Sun v. Santacruz, No. EDCV-25-02198-JLS-JCx, 2025 WL 2730235, at *5-6 (C.D. Cal. Aug. 26, 2025) and Yang v. Kaiser, No. 2:25-CV-02205-DAD-AC (HC), 2025 WL 2791778, at *7-10 (E.D. Cal. Aug. 20, 2025)).  In the parole/recognizance situation, Courts have found that the noncitizen "gained a liberty interest in their continued freedom when DHS elected to release them on their own recognizance under section 1226(a), which implied a promise that they would not be re-detained so long as they abided by the terms of their release."  Valencia Zapata v. Kaiser, 801 F. Supp. 3d 919, 934 (N.D. Cal. 2025).  See also Hongwei Zheng v. Kristi Noem, et al., No. EDCV 26-0675 JGB (RAO), 2026 WL 851434, at *3 (C.D. Cal. Mar. 25, 2026) ("the Court finds that under the Fifth Amendment's Due Process Clause, Petitioner has a liberty interest in due process protections prior to re-detention following a grant of release on own recognizance."); Gourav Gourav v. James Janecka, et al., No. EDCV 26-01253-MWF (DSR), 2026 WL 966568, at *2 (C.D. Cal. Apr. 7, 2026) (noncitizen detained upon entry without inspection and seeking asylum who was then released on his own recognizance pending removal proceedings and who thereafter attended his check-ins and immigration court hearings, obtained work authorization, and lived in the community for two years had a protected liberty interest in remaining out of custody following his release on his own recognizance); J.A.E.M. v. Wofford, 812 F. Supp. 3d 1058, 1067, 1069 (E.D. Cal. 2025) (noncitizen detained at border then released pending removal proceedings has protected liberty interest in that own-recognizance release for purposes of due process analysis).  The release on own recognizance of a noncitizen apprehended at the border is an implicit promise that he or she would be able to stay free from

detention for the duration of administrative proceedings absent changed circumstances, and thus a protected liberty interest for purposes of due process analysis.  See Banol, v. Warden, No. 5:26-CV-00529-CAS-ACCV, 2026 WL 776793, at *5 (C.D. Cal. Mar. 19, 2026).

The uncontroverted facts on this Application are confusing as to the specific type of immigration release Petitioner enjoyed prior to her April 24, 2026, re-detention.  Exhibit "C" to the Petition indicates that Petitioner's "Class of Admission" was "DT."  Such classification indicates immigration authorities granted her "humanitarian parole" under 8 U.S.C. § 1182.  See Noori v. LaRose, 807 F. Supp. 3d 1146, 1157 (S.D. Cal. 2025).  Indeed, Petitioner argues in the Application that she "was paroled into the United States."  Application at 9:24-25.  The Verified Petition alleges, however, that Petitioner "was released from detention by parole under OSUP, subject to ICE check-ins."  Pet. at ¶41.  An OSUP is generally, at least in this Court's experience, granted to a person already subject to a final order of removal, not an applicant for admission.  Indeed the OSUP cited in support of that allegation in the Petition, and attached thereto as Exhibit "D," states that pursuant to a Final Order dated April 6, 2022, Petitioner was "ordered [e]xcluded or deported pursuant to proceedings commenced prior to April 1, 1997," but "[b]ecause the agency has not effected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision and permitted to be at large under the following conditions."  Pet. at Ex. "D."  Petitioner could not have received a final order of removal from "proceedings commenced prior to April 1, 1997," however, because at least according to Exhibit "C" to the Petition (also a Government document), Petitioner was not born until nearly three years later, on February 22, 2000.  Cf. Pet. at Ex. "C."

Nevertheless, regardless of the specific type of release Petitioner enjoyed, it is clear from the present record that immigration authorities released her and permitted her to be at liberty ("at large" in the words of Exhibit "D") in the United

11

States subject to conditions for several years prior to her re-detention at her ICE check-in on April 24, 2026.  Under the authorities discussed above, Petitioner has a constitutionally protected liberty interest in that release which, under the Fifth Amendment, she may not be deprived of without due process of law.

### b.    Matthews Factors

The Court now turns to the question of whether Petitioner is likely to succeed on her claim that she was deprived of that interest without due process of law.  Under Mathews v. Eldridge, the Court considers three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U.S. at 335.

Under the first factor, courts have regularly described a petitioner's interest in remaining out of custody as "substantial."  Diaz v. Kaiser, No. 3:25-CV-05071, 2025 WL 1676854 (N.D. Cal. June 14, 2025).  The weight of the factor increases as a party remains on bond for an extended period.  Morrissey, 408 U.S. at 482.  Here, Petitioner was released in April of 2022.  See Pet. at Ex. "D."  Thus, she enjoyed release for approximately four years prior to Respondents re-detaining her on April 24, 2026.  Id. at ¶ 12.  During that time, she lived in the United States, sustained no arrests or criminal convictions, had a son, and became his caretaker.  Id. at ¶¶ 43, 45 and Exs. "E" - "F."  Petitioner's interest in her conditional release is significant.

As to the second factor, the risk of an erroneous deprivation of Petitioner's liberty interest is high, with no process offered to Petitioner to evaluate the propriety of her re-detention.  Petitioner received no "explanation of the justification for her re-detention, and no opportunity to contest her detention before a neutral adjudicator before being taken into custody."  Pet. at ¶ 58.

12

Perhaps there was some change in circumstance that could justify revocation of Petitioner's release status (though Respondents do not offer any in their Opposition).  A pre-deprivation hearing would require the government to produce its evidence of changed circumstances and give Petitioner an opportunity to challenge that evidence.  This is a significant procedural safeguard.  Without written notice and a meaningful, individualized hearing, "the risk of an erroneous deprivation of liberty is high because neither the government nor [Petitioner] has had an opportunity to determine whether there is any valid basis for his detention."  Fernandez v. Semaia, No. 5:25-CV-03412-SPG-MBK, 2026 WL 136229 at *5 (C.D. Cal. Jan. 13, 2026).  This second Mathews factor therefore also favors Petitioner's likelihood of success on the merits of her procedural due process claim, at least on the current record.

As to the third factor, "the government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions."  Hernandez v. Sessions, 872 F.3d at 994.  The Government's previous decision to release Petitioner on parole demonstrates that the Government found that she was not a danger to the community and that her presence in future immigration proceedings could be "ensured by ... alternative conditions."  Id.; see also Pet. at ¶ 41 ("After ICE determined that she was not a flight risk nor a danger to the community, she was released from detention by parole under OSUP, subject to ICE check-ins.").  Again, there is no indication here of any changed circumstances that would alter that determination, and even if there were, Petitioner has not been permitted any opportunity to challenge any such change in circumstances.

Because all three of the Mathews factors point in Petitioner's favor, Petitioner has shown a likelihood of success on her procedural due process claim.

13

**ii.        Irreparable Harm**

Petitioner is suffering irreparable harm because she is likely being detained in violation of her constitutional rights.  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Hernandez, 872 F.3d at 994 (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)).  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." Warsoldier v. Woodford, 418 F.3d 989, 1001–02 (9th Cir. 2005) (cleaned up) (quoting from treatise).  Accordingly, the second Winter factor favors Petitioner.

**iii.       Balance of Equities and Public Interest**

Where the government is the opposing party, the balancing of the equities and the public interest merge.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  As with irreparable injury, when a Plaintiff (or here, Petitioner) establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor [injunctive relief]." Arizona Dream Act Coalition v. Brewer, 757 F.3d 1053, 1069 (9th Cir. 2014).  Like the rest of the issues on the merits, Respondents failed to address the balance of the equities, and fail to assert any countervailing interest against issuance of the TRO.  The Court sees none, as Respondents would not suffer any hardship if the TRO is issued because the government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013).  As such, the balance of the equities and public interest tips in favor of Petitioner.

**iv.       The Status Quo to be Preserved is Petitioner's Condition Prior to Her Re-detention on April 24 2026**

Given the likely violation of Petitioner's due process rights in revoking her release and re-detaining her, preservation of the status quo on the TRO requires her release on the same conditions that were in place prior to her April 24, 2026,

14

re-detention.  The status quo is "the last uncontested status which preceded the pending controversy."  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000) (internal quotation marks omitted).  The last uncontested status here is Petitioner's release (whether on parole or OSUP) before her current re-detention.  See Nazarian v. Noem, No. 5:25-cv-2694-KK-ADS, 2025 WL 3236209, at *7 (C.D. Cal. Nov. 3, 2025) ("The last uncontested status in this case is Petitioner's release on his second OSUP before his current re-detention.").  "Accordingly, Petitioner's release from custody is the appropriate remedy."  Id.; see Esmail v. Noem, No. 2:25-cv-8325-WLH-RAO, 2025 WL 3030590, at *6 (C.D. Cal. Sept. 12, 2025) ("Providing Petitioner an interview ex post facto, while keeping him detained in ICE's custody, would not remedy the apparent constitutional violation that Petitioner has suffered in being re-detained without any measure of due process.  The fact that he was not given an interview renders his detention unlawful in the first place, necessitating his release.").

**C.    Bond**

Rule 65(c) provides that a court may require a party seeking injunctive relief to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Despite this mandatory phrasing, "Rule 65(c) invests the district court with discretion as to the amount of security required, if any."  Johnson v. Couturier, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003)) (emphasis in original).  A court may dispense with a bond altogether "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."  Id. (quoting Jorgensen, 320 F.3d at 919).  Courts have also waived security where requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public."  Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. 719, 738 (C.D. Cal. 1996).

15

Here, the Court cannot identify any monetary harm Respondents would suffer as a result of the injunction, and Respondents have not asserted any in their Opposition.  Where, as here, Petitioner has demonstrated a likelihood of success on the merits and the injunction safeguards fundamental due process rights, requiring a bond would serve no protective purpose and would risk burdening access to constitutionally grounded relief.  See Couturier, 572 F.3d at 1086; Baca, 936 F. Supp. at 738.  Accordingly, the Court **WAIVES** the bond requirement.

**4.      CONCLUSION**

For the reasons stated above, the Court **GRANTS** Petitioner's Application for a Temporary Restraining Order and OSC re Preliminary Injunction (Doc. No. 3.).

IT IS HEREBY ORDERED that:

1.      Respondents are ORDERED to release Petitioner immediately from Respondents' custody, subject to the conditions of her prior release before being re-detained on April 24, 2026.

2.      Respondents are ENJOINED and restrained from revoking Petitioner's conditional release and re-detaining her unless and until she receives adequate notice and a hearing to determine the legality of such revocation and re-detention.

3.      Respondents are further ORDERED TO SHOW CAUSE, in person on Friday, May 22, 2026, at 10:00 a.m., why a preliminary injunction should not issue.

4.      This Order will be in effect for a period of fourteen (14) days from entry hereof, after which it will expire absent further order of the Court.

5.      This Temporary Restraining Order does not alter or suspend the parties' obligations under the standard schedule for briefing the petition for final disposition.

**IT IS SO ORDERED.**

DATED**:** May 11, 2026                    _____

                                            HON. DANIEL S. ROBERTS
                                            UNITED STATES MAGISTRATE JUDGE

16